785 So.2d 197 (2001)
STATE of Louisiana, Appellee,
v.
Roy MURPHY, Appellant.
No. 34,624-KA.
Court of Appeal of Louisiana, Second Circuit.
April 6, 2001.
*198 Louisiana Appellate Project, By Peggy J. Sullivan, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen T. *199 Sylvester, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, STEWART and CARAWAY, JJ.
STEWART, J.
The defendant, Roy Murphy, was convicted of attempted aggravated rape in violation of La. R.S. 14:42A(4) and sentenced to 50 years imprisonment at hard labor, from which he now appeals. Finding no merit in the defendant's assignments of error, we affirm his conviction and sentence.

FACTS
During the summer of 1994, Erica Dubois resided at the Siesta Motel with her mother, Mary Dubois ("Mary"), Erica's three sisters-Kalisha, Shameka, and Kenyatta, Roy Murphy ("Murphy"), and John Pinkston ("Pinkston"). At this time, Mary Dubois was married to Otha Dubois, but she was involved in sexual relationships with John Pinkston and Roy Murphy. On the night of the rape, Mary and her four daughters were together at the Siesta Motel with her "boyfriends" John Pinkston and Roy Murphy. Further complicating this unusual arrangement, Mary requested that the children refer to Murphy as her cousin so that Pinkston would not get suspicious. Earlier that night, Mary, Pinkston, and Murphy consumed several beers while playing cards. Erica, then 11 years old, was lying on the floor. Roy, who was 37, was too drunk to return home, so he spent the night.
Erica testified that she was afraid to follow her mother's instruction that she sleep next to Murphy because he had "messed with her" before, and her mother knew of these previous incidents of molestation. Although unable to articulate specific dates, Erica testified about two previous incidents that occurred during the summer of 1994 where Murphy was drunk and fondled her vagina with his fingers.
Erica stated that after everyone in the room went to sleep, Murphy placed his hand over her mouth to keep her from screaming. Next, he pulled down Erica's shorts and his pants, laid on top of her, and engaged in vaginal sexual intercourse with Erica for approximately fifteen minutes as her mother lay asleep next to them. Erica stated that she was scared to cry out for help because Murphy's knife was somewhere nearby. When he finished, Murphy promised her money if she did not tell her mother.
Erica's older sister, Kalisha, testified that the morning after the rape, Erica was crying as she explained the events of the rape to her. When Erica told her mother about the rape, Mary performed a check of Erica's underwear and Murphy's penis for blood, and finding none, determined that Erica was being untruthful.
Dr. Meade O'Boyle, a child physician specializing in evaluating children for sexual abuse, examined Erica 10 months after the incident on April 10, 1995. Dr. O'Boyle could not conclusively testify that Erica had not been penetrated by another object. However, Dr. O'Boyle opined that Erica's vagina had been penetrated by an adult male penis because aspects of the child's vaginal tissue, referred to as labia, were very tight instead of floppy as they would be after a voluntary act of sexual intercourse. She testified that her theory was that the formation of a child's labia was determinative of the occurrence of involuntary sexual intercourse. Dr. O'Boyle testified that her unpublished, untested theory was based on several years experience in conducting child examinations to detect sexual abuse. Further, she testified that her examination revealed that the child's *200 vagina had healed after what appeared to be a one-time injury to her vagina.
Dr. O'Boyle also observed that it was difficult for Erica to disclose the events surrounding the rape because the disclosure made Erica very upset and very emotional. Dr. O'Boyle also testified that Mary was very angry, and shouted at Erica throughout the exam insisting that she not tell what happened.
Murphy testified that he absolutely could not remember what happened that night. However, he remembered that Erica was told to sleep between him and Mary to avoid any suspicion from Pinkston. Murphy testified that he was drunk at the time that he gave a statement to the police investigating the incident, and that he was not given time to sober up. He insisted that his statements about sexual relations were in reference to Mary and not Erica. However, an examination of that statement clearly indicates that Murphy was referring to Erica.
Because Erica's mother did not report the rape until February of 1995, the crime was not investigated by Detective Rita McCormick of the Monroe Police Department and Debra Sherrill, a social worker in the Office of Community Services, until March 23, 1995.
At the conclusion of trial, the jury entered a unanimous responsive verdict of guilty for attempted aggravated rape. The court sentenced the defendant to 50 years imprisonment at hard labor. The court denied Murphy's oral motion to reconsider sentence.

DISCUSSION

Sufficiency of Evidence
Murphy argues that facts adduced from the testimony offered at trial were insufficient for the state to meet its burden of proof to support his conviction for attempted aggravated rape. Murphy contends that Dr. O'Boyle's examination produced no conclusive results linking him to raping Erica. In further challenging Dr. O'Boyle's results, Murphy argues in brief that her testimony was inadmissible. However, because defense counsel failed to object on the record to the admissibility of statements made by Dr. O'Boyle, our sufficiency of evidence review cannot include evaluating the scientific basis of her conclusions.
The state argues that the victim's testimony proves beyond a reasonable doubt that Murphy was guilty of aggravated rape. The expert testimony was conclusive in finding that sexual intercourse had occurred. The victim's physical exam showed that the victim's vagina was wide enough to admit an adult male penis.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
Under Jackson v. Virginia, supra, the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational *201 trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). Accordingly, the reviewing court's role is not to assess credibility or reweigh evidence. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165; State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gradick, 29,231 (La.App.2d Cir.1/22/97), 687 So.2d 1071; State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760.
The defendant was convicted of attempted aggravated rape in violation of La. R.S. 14:42A(4) which provides in pertinent part:
A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
(4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.
Under La. R.S. 14:41, a rape is defined as follows:
A. Rape is the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent.
B. Emission is not necessary and any sexual penetration, vaginal or anal, however slight is sufficient to complete the crime.
Under La. R.S. 14:27A, an attempt is defined as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances he would have actually accomplished his purpose.
Under La. R.S. 14:10, the definition for criminal intent provides that
Criminal intent may be specific or general:

*202 (1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.
(2) General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
The testimony of the victim alone is sufficient to prove the elements of the offense even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505; State v. Walters, 26,888 (La. App.2d Cir.5/10/95), 655 So.2d 680. Violation of La. R.S. 14:41 occurs when there is any penetration, however slight, of the aperture of the female genitalia, even its external feature. State v. Lewis, 577 So.2d 799 (La.App. 2d Cir.1991), writ denied, 582 So.2d 1304 (La.1991).
When viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that based on all of the testimony in this case, Murphy was guilty beyond a reasonable doubt of every essential element of the crime.
Murphy's own statement to the police concerning this incident was sufficient for a rational trier of fact to find him guilty beyond a reasonable doubt of attempted aggravated rape. The following exchange between Murphy and Monroe Police Detectives Rita McCormick and Larry Linson reveals what happened on the night of the rape:
Q. Okay, okay, tell me what happened at the motel.
A. Well, that's the night that I.. if I had a fooled with her, I didn't know.. that's the night uh, that I put my penis between her legs.. that's the night.
Q. okay. When you say you put it between her legs, where did it go?
A. Well, I.. was drunk, I really.. don't know. I really don't know, if it.. went in.. went up.. went in her or not.. you know, I was drunk.
* * *
Q. Um-hum. So what part of her body do you think your penis touched?
A. I..I reckon between her legs, as far as I know, I don't..I don't know it, like, inside, I can't..I don't know, but uh, when I..I put my penis between her legs, but like I say, I didn't force her or nothing like that there.
It is clear from Murphy's own account of his actions that night that he at least attempted to have sex with Erica. His lack of clarity as to whether or not he penetrated her is immaterial. The jury convicted him of attempted aggravated rape.
Moreover, Erica's testimony alone was sufficient to prove the elements of the attempted aggravated rape. State v. Ingram, supra. According to Erica's testimony, Murphy intended to have sexual intercourse with her when everyone in the room was asleep. He covered her mouth to prevent her from crying for help, and he also promised her money for her silence.
Moreover, Erica's testimony about previous incidents of molestation by the defendant and knowledge of this abuse by family members was probative in establishing that Murphy had a pattern of touching Erica in a sexual manner. Erica *203 testified that during the summer of 1994, but prior to the rape, Murphy placed his fingers in her vagina. The first incident occurred at Erica's grandmother's home when Murphy spent the night because he was too drunk to return home. The second incident took place at a motel where Murphy touched her "private parts." After each incident, Erica testified that she told her sister Kalisha. Kalisha testified that she was told about the incidents at the motel and her grandmother's house, and she observed that Erica did not want to be around Murphy whenever he was around their family. Mary's knowledge of the prior incidents of abuse was not explored further during her testimony. However, Mary did admit that she denied Erica's accusations of being molested by Murphy prior to the rape. Mary stated that she was in denial when Erica complained of the rape even though Erica never changed her story.
Testimony by Dr. O'Boyle established that the child had been penetrated. Her testimony was not conclusive on the fact of whether or not penetration was by an adult male penis or other object. Dr. O'Boyle, a child physician, examined the victim on April 10, 1995, approximately 10 to 11 months after the occurrence of the rape. Dr. O'Boyle opined that the penetration was from a one-time occurrence between an adult male penis and a child's vagina. Though not scientifically supported, Dr. O'Boyle observed that Erica's labia were "pre-pubical" virginal kind of labia and her hymenal ring had been torn and large enough to admit an adult, male penis. Enlarged photos of the child's vagina were reviewed by the jury. Dr. O'Boyle's explanation for observing a one-time injury was that, if the child had been sexually active, her labia would have been floppy as opposed to very tight tissue. Defense counsel did not object to Dr. O'Boyle's testimony regarding her theory. Instructions to limit this testimony were not requested by defense counsel. Thus, a fact finder could make a rational determination that there was penetration based on findings presented in Dr. O'Boyle's testimony. Although Murphy argues that the physical results were not conclusive that he was the perpetrator, the jury found Erica's testimony to be credible.
Murphy argues that the evidence was insufficient because Erica sustained no physical injuries from the rape. Secondly, medical evidence presented at trial did not connect him to the rape. However, the state does not have to introduce medical or scientific evidence to prove elements of an offense. See State v. Ingram, supra. Thus, Erica's testimony alone would be sufficient to prove that Murphy was guilty of the offense charged. Murphy, in brief, highlights the conflict in testimony given by Erica and Kalisha on the actual sleeping arrangements in the hotel on the night of the rape. However, our sufficiency of evidence review does not extend to credibility determinations. Nonetheless, such a conflict does not render the jury's conclusion that Murphy raped Erica invalid because other evidence confirms that Murphy was guilty beyond a reasonable doubt. Next, Murphy argues that witness testimony about previous occurrences of molestation was not concrete. This contention is without merit. The evidence does establish that there was improper interaction between Murphy and Erica prior to the rape. Moreover, a fact-finder could determine that there was an attempted aggravated rape. Murphy's contention that the evidence was insufficient to convict him of attempted aggravated rape is without merit.

Expert Testimony
Murphy argues that reversible error occurred when the court allowed Dr. *204 O'Boyle, a child physician specializing in cases involving child sexual abuse, to testify about the truthfulness of the victim's testimony about being sexually assaulted. He asserts that the testimony was inadmissable expert witness testimony concerning the credibility of a witness pursuant to La. C.E. art. 702. Murphy claims that statements made by Dr. O'Boyle about the victim's credibility infringed upon the jury's duty to make credibility determinations about witnesses.
The state argues that the court's action did not prejudice the defendant. The trial court overruled defendant's objection because the expert could testify whether in her opinion the history of sexual abuse given by an individual was given falsely. Additionally, the state asserts that testimony concerning the victim's physical exam established that the results of the exam were consistent with the history that the victim gave.
At trial, the state properly laid the foundation for Dr. O'Boyle to testify in general terms about her physical examination of the victim. The record shows that the court stated that Dr. O'Boyle could testify whether, in her opinion, the history given by the individual was falsely given or not. The court, over defense counsel's objection, allowed Dr. O'Boyle to explain that Erica's characteristics were similar to those of an abused child, and to testify that the child was not coached. Defense counsel promptly moved for a mistrial which was denied. The record reflects testimony by Dr. O'Boyle on direct examination that did not result in prejudice to the defendant.
Q. Dr. O'Boyle, in your work in examining children for sexual abuse and taking history of children for sexual abuse do you have occasion to come across child (sic) wherethat you feel may have been coached into saying something?
A. Yes, I do. We can usually tell that the child is not telling the truth from the demeanor of the child.
By Mr. Scott:
May it please the Court, I object she is now invading the problem (sic) to (sic) the Jury. It's the Jury's problems (sic) to determine whether or not a witness tells the truth or not.
By the Court:
The doctor can testify whether in her opinion the history given by the individual was given falsified (sic) or not.
By Ms. Hamm:
Thank you.
By the Court:
Overruled, Mr. Scott.
Q. Continue.
A. Usually one can tell about ... through watching the demeanor of the child and the amount of eye contact they make and whether or not they're really emotionally involved with the situation about the truthfulness of the child. This child seemed to be a very, very good historian.
Q. Was there anything about this child that made you feel like she was coached?
A. No, she was not coached.
By Mr. Scott:
Just for the record I move for a mistrial.
By the Court:
Overruled.
By Ms. Hamm:
Thank you, Your Honor.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, *205 training, or education, may testify thereto in the form of an opinion or otherwise. La. C.E. art. 702. The Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), discussed in detail the application of La. C.E. art. 702 in cases where experts testified about Child Sexual Abuse Accommodation Syndrome (CSAAS). The court explored the merits of CSAAS as a diagnostic tool and CSAAS as a tool used to assess the victim's credibility. Murphy argues that precautions as established in State v. Foret, supra, prohibited the admissibility of testimony given by Dr. O'Boyle.
In Foret, the court articulated that testimony by an expert witness that bolstered the credibility of a witness unfairly prejudiced a criminal defendant. Id. at 1129. In that case, the trial court found that the expert testified about his expert opinion on the victim's credibility and did not limit his testimony to general information. The expert opined that the witness was telling the truth about the occurrence of sexual abuse. The court found that this testimony was inadmissible, and the trial court's overruling of the objection erroneous.
In Foret, the expert was allowed to testify as to the truthfulness of the child's statements in order to explain the reason for the delay in informing the authorities. In the instant case, the reason for the 10 month delay from the rape to reporting the incident to the police is solely attributed to Erica's mother who refused to believe her daughter's story. Because of the case-by-case determination of the admissibility of expert testimony commenting on characteristics of victims in cases involving child sexual abuse, the testimony by Dr. O'Boyle must be evaluated for content that may have actually prejudiced the defendant and in light of the evidence presented at trial. We find that the statements made on direct examination were not made in general terms, but were offered to bolster the credibility of the victim. The defense counsel promptly objected to testimony involving the truthfulness of the witness when the state asked if there were ways to determine if a child's demeanor was indicative of his having experienced sexual abuse. Testimony on whether the child was coached to accuse the defendant of sexual abuse is testimony commenting on the credibility of Erica. We find O'Boyle's statements to be inadmissible under Foret. However, we also find that the admission of such statements was harmless error. Without considering Dr. O'Boyle's statement, a rational trier of fact could find, based on Murphy's own statement, that he raped or attempted to rape Erica.

Jury Instructions
Murphy argues that the court's failure to give the jury a charge concerning the defense "mistake of fact" was not harmless error. Under the factual circumstances indicated, Murphy claims to be unaware of what happened because of his drunken state.
The state argues that because the evidence showed that Murphy was aware of his surroundings and that he was engaging in sex with the victim, it is impossible that he was under the mistaken belief that he was engaged in sexual intercourse with the victim's mother.
This claim is without merit. During Murphy's cross-examination about his statement to the police, he claimed that he did not remember what happened and if something did happen because of the victim's lack of response, he thought it was her mother. In his testimony, Murphy admitted that he made a "mistake." In fact, he acknowledged that he had "messed with" Erica. In his statement to police Murphy stated that he placed his "penis *206 between her (Erica's) legs." While Murphy claims to not remember the events of that night, he was adamant about the fact that his penis "didn't go all the way in" Erica.
The defense of mistake of fact requires a reasonable ignorance of fact or mistake of fact which precludes the presence of any mental element required in that crime. La. R.S. 14:16. Along with establishing this defense, a special jury charge by the court under La.C.Cr.P. art. 807 shall not require qualification, limitation or explanation, and it is required to be wholly correct and pertinent. In State v. Fletcher, 341 So.2d 340 (La.1976), where the defendant was convicted of aggravated rape, the court found that the defense of mistake of fact was not applicable because the defendant was not reasonably justified in believing that the victim consented to the rape because she did not resist. Thus, the mistake of fact defense must be applicable before the court performs its duty in providing a special charge under La.C.Cr.P. art. 807.
Here, the trial court properly denied the defendant's request for a special jury charge on the defense of mistake of fact. The trial court denied Murphy's request on the grounds that the defendant's testimony was that he did not remember what happened. Thus, the court found that the defendant's actions were unreasonable, and the trial court properly denied defense counsel's request for a special jury charge. This assignment of error is without merit.

Excessive Sentence
Murphy argues that the 50-year sentence imposed by the judge was excessive. He claims his sentence was not proportionate to sentences given to other similarly situated offenders, and the trial court should have granted the defendant's timely filed motion to reconsider sentence. The state argues that the defendant's sentence was not excessive since the Louisiana legislature enacted penalties in alignment with the gravity of the crime.
Review by an appeal court of a sentence for excessiveness is two pronged. First, the record must show sufficient consideration of the criteria set forth in La. C.Cr.P. art. 894.1. Second, the circumstances of the case and the background of the defendant must be examined. State v. Smith, 433 So.2d 688 (La.1983); State v. Brown, 33,504 (La.App.2d Cir.6/21/00), 764 So.2d 197; State v. Bradford, 29,519 (La. App.2d Cir.4/2/97), 691 So.2d 864.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate, if when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Brown, supra; State v. Bradford, supra.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, this court does not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Brown, supra.
In this case, the jury entered a responsive verdict against Murphy for attempted aggravated rape in violation of La. R.S. 14:42 which provides the following penalty,
C. Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit *207 of parole, probation, or suspension of sentence.
La. R.S. 14:27D which proscribes the penalties for an attempt provides that,
D. Whoever attempts to commit any crime shall be punished as follows:
(1) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not more than fifty years.
Murphy filed a motion to reconsider sentence asserting that his sentence should be reconsidered on the grounds that no one was brutalized; the current conviction was his first felony conviction; he should not be considered one of the worst offenders of aggravated rape; and the sentence should be less than 50 years.
During Murphy's sentencing hearing, the trial court did consider his age 39, eighth-grade educational level, and his marital status as divorced with children that did not depend on him. The trial court stated that Murphy needed correctional treatment. Murphy's misdemeanor record was given little significance in determining his sentence. Reference was made to the pre-sentence report that contained information concerning two previous incidences of child molestation of the same victim. The court determined that Murphy's abuse of alcohol would make a subsequent occurrence more probable than not, but that the likelihood of the recurrence was unknown. The trial court was convinced by the fact that Murphy did not remember if he had penetrated the child victim. The evidence clearly showed that he was guilty of aggravated rape. Based on these considerations, the judge found the maximum sentence appropriate. Thus, consideration by the court pursuant to La. C.Cr.P. art. 894.1 was sufficiently given.
The court entered a sentence within the statutory limits. Moreover, since the victim in this case was a child, this sentence does not shock the sense of justice. Therefore these assignments are without merit.

Pro Se Assignment of Error
In addition to the arguments raised in brief, Murphy, by pro se argument, asserts that the verdict render by the jury was illegal. Murphy contends that he was convicted by and 8-4 margin instead of the requisite 10-2 margin of attempted aggravated rape. However, this contention is without merit. Our thorough review of the record reveals that there was some confusion on the jury when they initially voted. When the jurors were polled by the judge, some of them gave different responses than what they had written on the verdict sheets which explains why the vote was by an 8-4 margin. However, the judge sent the jurors back into the deliberation room, and when they returned, they unanimously found Murphy guilty of attempted aggravated rape.

CONCLUSION
For the foregoing reasons, we find that Murphy's assignments of error are without merit and his sentence and conviction are affirmed.
AFFIRMED.