3 So.3d 685 (2009)
STATE of Louisiana, Appellee
v.
Geoffrey EASON, Appellant.
No. 43,788-KA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 2009.
*687 Louisiana Appellate Project by: Peggy J. Sullivan, Monroe, for Appellant.
J. Schuyler Marvin, District Attorney, John M. Lawrence, Charles A. Smith, C. Sherburne Sentell, III, Edward C. Jacobs, Assistant District Attorneys for Appellee.
Before BROWN, STEWART and PEATROSS, JJ.
STEWART, J.
Defendant, Geoffrey Eason, was charged with two counts of armed robbery with a firearm. A jury found Eason guilty as charged on both counts, and the court sentenced the defendant to serve two concurrent terms of fifty years' imprisonment at hard labor without parole. Eason now appeals, urging five assignments of error. We affirm the defendant's convictions, but vacate his sentences and remand for resentencing due to an error patent.

FACTS
On the evening of January 31, 2006, Dr. Wayne McMahen and his teenage daughter, M.M.[1], returned to their home in Springhill, Louisiana, after attending a *688 ballgame. M.M. went to her room, while Dr. McMahen sat in the den watching the news. Dr. McMahen heard the family dog barking in the kitchen, so he went into the kitchen to let the dog out into the yard. As he opened the sliding glass door, a masked man, armed with a gun, rushed into the door. Dr. McMahen tried to slam the door shut, but the armed man put his hand into the doorframe to hold the door open.
The armed man entered the home, followed by two other masked men. The men forced Dr. McMahen to the ground and demanded money. Dr. McMahen gave the men his wallet, and the man with the gun held Dr. McMahen down while the other two men searched the house for valuables. Dr. McMahen saw that the gunman's injured hand was bleeding on the floor.
One of the other two men entered M.M.'s room and demanded money; M.M. surrendered several hundred dollars to the masked man. When that man left her room, M.M. went to her door to look down the hall, and another masked man armed with a gun slammed her door shut. When M.M. heard another door slam, she believed that the men had left, so she came out of her room only to find the three men, two of whom had guns, still in the home. M.M. returned to her room.
Dr. McMahen then told the men that his keys were in his truck. After some discussion among themselves, the men took the truck and left. Dr. McMahen immediately called his wife, who was at Dr. McMahen's office, and asked her to call police. Dr. McMahen's truck was equipped with the OnStar system, so Dr. McMahen called OnStar, which then located the truck via satellite within ten or fifteen minutes.
In the meantime, Springhill police arrived at the McMahen residence. Police Chief Ronnie Coleman found the robber's blood on the floor. He explained that he used sterile water and a sterile swab to collect the blood evidence to permit later testing. Coleman put the sample into a bag, then another officer marked the bag for identification and sealed the bag, and then Chief Coleman stored the evidence in a secure closet. Coleman admitted that he had no special training in the collection of DNA evidence.
The robbers were not located with the truck, so in the ensuing days police questioned various people in the community about their knowledge of the crime. The police developed a juvenile suspect, Alva Tealer, and questioned Tealer in the presence of his mother. After waiving his rights, Tealer admitted his involvement in the crime and named the defendant, and another man, Standrius White, as the other two participants.
Police found and questioned White and Eason, and then arrested the men for armed robbery. After their arrest, White and Eason were placed in the back of a patrol car. The patrol car was equipped with a video camera whose microphone recorded a whispered conversation between White and Eason at the time of their arrest; in part of the conversation, one of the men can be heard to say "... he slammed my hand in the door...." In addition, police took DNA swabs from the men's mouths. Laboratory analysis showed that the blood on the McMahens' floor came from the defendant, Geoffrey Eason. Because the men wore masks during the robbery, the victims were unable to identify them.
The state charged both Eason and White with armed robbery with a firearm of both victims. The case was assigned to Judge John Robinson. The defendants joined in a motion to recuse Judge Robinson and a motion to change the venue. *689 The motion to recuse was heard by Judge Bolin. Judge Robinson was called as a witness and testified that he had, for many years, lived three doors down from the McMahens and that he and Mr. McMahen had once been "pretty good" friends and frequently visited each other's homes. The judge had also been friends with Dr. McMahen's father, the former sheriff. However, the judge said that he was no longer close friends with Dr. McMahen and had seen him only rarely since moving away from Springhill in 2000.
In addition, Judge Robinson had only recently placed Eason on probation for another offense at the time Eason committed this offense. The judge said that he was disappointed to hear that Eason was involved and might have voiced that disappointment to others. Judge Robinson stated that neither his prior friendship with the victim nor his recent judicial encounter with Eason would prevent him from presiding over the case in a fair and impartial manner.
After hearing Judge Robinson's testimony, Judge Bolin concluded that Judge Robinson's relationship to the victim was "not of a substantial nature to the extent that it would affect his ability to be fair and impartial." The judge was convinced that Judge Robinson would not be biased, prejudiced or have any personal interest in the result; consequently, the judge found that Judge Robinson could conduct a fair and impartial trial and denied the defendants' motion over their stated objection.
The defendants opted to be tried together. At the outset of the trial after the jury was selected, the judge denied the motion for a change of venue. In addition to the evidence outlined above, Alva Tealer testified at the trial. Pursuant to a plea agreement in consideration of his future testimony, Tealer had already pled guilty to armed robbery and was serving a 10-year hard labor sentence. He said that on the day of the robbery, Eason told Tealer that Eason was looking for a "quick money scheme." Tealer said that Eason armed himself with a gun before Eason, White and Tealer decided to break into a home. Tealer said that they went to Dr. McMahen's home, went into the back door and forced Dr. McMahen to the floor at gunpoint. Tealer said that the robbers took the money from Dr. McMahen's wallet. He said that he was not the one who encountered M.M. Tealer said that the men then took Dr. McMahen's truck and escaped.
With regard to the DNA evidence, the crime lab technician, Pat Wojtkiewicz, testified that samples of blood from a crime scene are often recovered using a cotton swab and that these swabs are then submitted for testing. The technician computed a probability of one in 19.6 trillion that the blood sample submitted from the scene by Coleman belonged to a person other than Eason.
The defendants chose not to testify. On December 4, 2006, the jury convicted both defendants as charged with two counts of armed robbery with a firearm; the verdict was unanimous as to Eason. On March 5, 2007, the court sentenced Eason to serve fifty years' imprisonment at hard labor, for each conviction, without benefit of parole, and the court imposed those sentences concurrently. Eason filed a motion to reconsider sentence, which the trial court denied. Eason now appeals, urging five assignments of error.

LAW AND DISCUSSION

Assignment of Error Number Four: Sufficiency of the Evidence
In the fourth assignment of error, the defendant argues that the evidence was not legally sufficient to support his *690 conviction of two counts of armed robbery with a firearm. More specifically, he challenges the state's proof of his identity through the DNA evidence on the grounds that this evidence could have been improperly collected at the scene by Coleman. Eason urges that the remaining evidence was insufficient to convict him, because the victims could not identify the robbers and because Tealer's testimony was unreliable.
When issues are raised on appeal, both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Hill, 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758, writ denied, XXXX-XXXX (La.12/14/07), 970 So.2d 529; State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2d Cir.5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35. This applies to the testimony of accomplices.
An accomplice is a competent witness to testify against his co-perpetrator even if the prosecution offers him inducements to testify; these inducements only affect the witness's credibility. State v. Jetton, 32,893 (La.App. 2d Cir.04/05/00), 756 So.2d 1206, writ denied, 00-1568 (La.03/16/01), 787 So.2d 299. The credibility of an accomplice's testimony is not within the province of the court of appeal to decide. Id. Rather, credibility evaluations are within the province of the jury as trier of fact. Id. The fact finder is charged with making a credibility determination *691 and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.01/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Hughes, XXXX-XXXX (La.11/29/06), 943 So.2d 1047; State v. Powell, 27,959 (La. App. 2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
In the instant case, the defendant argued to the jury that Chief Coleman's collection of the DNA evidence might have invalidated the results of the scientific testing. To the contrary, the testimony of the crime lab technician, Pat Wojtkiewicz, did not show or even suggest any errors in the collection process. Wojtkiewicz stated that samples are often collected using cotton swabs, and this was the procedure employed by Chief Coleman in collecting the blood from the McMahens' floor. Although Wojtkiewicz said that errors in the collection process can lead to errors in the result, the evidence does not demonstrate that any error occurred in this case. Further, the laboratory evidently had no difficulty in testing the samples provided to it by Chief Coleman. The judge correctly allowed the DNA evidence into evidence, and the jury was thus entitled to rely on this evidence.
The DNA evidence is highly probative of the defendant's guilt in this case. The defendant's blood was found just inside Dr. McMahen's rear door at precisely the point where Dr. McMahen said the armed masked man bled due to having his hand slammed in the door. In addition to the DNA evidence, the jury heard the testimony of Mr. Tealer, who stated that Eason was armed with a firearm and was first through the McMahens' door during the robbery. The evidence presented was sufficient to prove beyond a reasonable doubt that Eason, armed with a firearm, committed the armed robbery with a firearm of Royce McMahen and M.M.
This assignment of error is without merit.

Assignment of Error Number One: Motion to Recuse
The defendant argues that the trial court erred in denying his motion to recuse Judge Robinson, because of the judge's friendship with the victim and prior judicial experience with the defendant. La.C.Cr.P. art. 671 provides, in pertinent part:
A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
(1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
* * *
(6) Would be unable, for any other reason, to conduct a fair and impartial trial.
This court rejected the identical claim of the defendant co-defendant, Standrius White, in State v. White, 42,725 (La.App. 2d Cir.10/24/07), 968 So.2d 901. A trial judge is presumed to be impartial, and the burden is on the defendant to prove otherwise. State v. Dooley, 38,763 (La.App. 2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30. In order to obtain a recusation based on bias, prejudice, and personal interest, *692 the party seeking the recusation must establish grounds of a substantial nature based on more than conclusory allegations. State v. Chatman, 37,523 (La. App. 2d Cir.9/24/03), 855 So.2d 875, writ denied, 2003-2821 (La.2/13/04), 867 So.2d 685. La. C. Cr. P. art. 671 does not require the recusal of a trial judge simply on the basis that the trial judge knew the victim's family. State v. Parker, 96-1852 (La.App. 4th Cir.6/18/97), 696 So.2d 599, writ denied, XXXX-XXXX (La.1/9/98), 705 So.2d 1097.
In State v. Gatti, 39,833 (La.App. 2d Cir.10/13/05), 914 So.2d 74, writ denied, 2005-2394 (La.4/17/06), 926 So.2d 511, the court considered whether the trial judge's recusal was required where a personal friendship existed between the judge and the victims. The court held that because there was no evidence that the judge's personal friendship with the victims would have caused the court to reach any conclusion based on bias, prejudice or personal interest, recusal was not warranted.
In White, supra, this court rejected the defendant's assignment of error on the grounds that the defendant "failed to produce evidence that the trial judge's prior relationship with the victim would result in bias or prejudice." On that same ground, the defendant's motion to recuse in the instant case is also without merit.
Additionally, the defendant asserts that the trial judge could not be fair and impartial because the judge had presided over Eason's former criminal proceeding. Jurisprudence has established that a judge who presided over a former trial involving the defendant is not, by that reason alone, required to recuse himself in the absence of a showing of bias or prejudice. See, e.g., State v. Bell, 346 So.2d 1090 (La. 1977). Judge Robinson testified that his prior judicial encounter with the defendant would not cause him to be biased or prejudiced in this case, and Judge Bolin accepted Judge Robinson's testimony as true. There is no showing of error in this regard, so this assignment of error is without merit.

Assignment of Error Number Two: Challenges for Cause
The defendant argues that the trial court erred in denying challenges for cause as to four jurors-Janice Brewton, Patricia Bearden, Robin Chreene-Rolen and Robin Fish. He states that because he exercised all of his peremptory challenges, he was forced to accept jurors that should have been excused.
The state argues that Eason actually exercised only ten of his peremptory challenges in selecting the main jury panel and one challenge as to an alternate juror. The chart of peremptory challenges in the record reflects that the defendant only used ten peremptory challenges, but the transcript shows that the defendant used all twelve of his challenges during the selection of the main panel. The chart is incorrect in attributing the peremptory challenge of jurors Vowell and Carnahan to White when it was Eason who challenged these persons.
La. Const. art. I, § 17(A) provides that a defendant has a right to challenge jurors peremptorily, with the number being fixed by law. In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant. La. C. Cr. P. art. 799. In this felony case, the defendant was entitled to twelve peremptory challenges.
Prejudice is presumed when a district court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. State v. Lindsey, XXXX-XXXX *693 (La.1/17/07), 948 So.2d 105; State v. Kang, 02-2812 (La.10/21/03), 859 So.2d 649; State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278. A district court's erroneous ruling which deprives a defendant of a peremptory challenge substantially violates that defendant's rights and constitutes reversible error. Kang, supra. When a defendant uses a peremptory challenge after a challenge for cause has been denied, the defendant must show: (1) erroneous denial of the challenge for cause; and (2) use of all peremptory challenges. Kang, supra.
Because the defendant used all of his allotted peremptory challenges in the selection of the main panel of jurors, prejudice to him is presumed if the trial court erred in denying one of his challenges for cause.
La. C. Cr. P. art. 797 provides, in part:
The state or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; . . . .
The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will only be reversed when review of the entire voir dire shows the trial judge abused his discretion. State v. Robertson, supra.
The first juror cited as objectionable was Ms. Janice Brewton. Fourteen years prior to the trial, Ms. Brewton had been employed as Dr. McMahen's veterinary assistant. She held that job for about five years and said that she knew McMahen's family "pretty well." She said that she "can't say these men are guilty because I don't know they are ... but by the same token, just because I was close to Wayne and Beverly I might harbor something inside that I-I just want to be totally honest about the whole thing." She also admitted that she had been the victim of a home burglary. However, she said that she could follow the instructions as given to her by the court and only consider the evidence presented in the courtroom. She agreed that she could serve as a fair and impartial juror. She said that she thought that she could put aside her connection with Dr. McMahen:
I'll be honest, I think I can, but as far as when it comes down to the bottom line, it's like I said, I would have to do what Judge Robinson said and I feel like I could do that.
Eason challenged Ms. Brewton for cause, citing her relationship with Dr. McMahen as evidence that she could not be fair and impartial. The prosecutor urged that Ms. Brewton said that she could put her relationship with the victim aside and be fair. The court stated:
I'll admit on Ms. Brewton when I first heard the state question her and she said she was a former employee and had a fairly close relationship with the family, I'm thinking in my mind this is, you know, obviously a challenge for cause *694 here. But the more I heard her talk and the more I heard her demeanor, she's a pretty independent thinking type lady and I think she was sufficiently rehabilitated. And I do-I think she-she said that she could be, put that aside and be fair and impartial. So I'm going to deny the challenge for cause on Ms. Brewton.
The court noted an objection for that ruling on behalf of both defendants. The defendant peremptorily challenged Ms. Brewton.
The prior employment relationship and friendship between Ms. Brewton and Dr. McMahen was properly the subject of extensive questioning because of the risk of bias or prejudice. See, e.g., State v. Brown, 496 So.2d 261 (La.1986). The record reflects that the attorneys thoroughly examined Ms. Brewton on the potential effect, if any, of her relationship with Dr. McMahen on the juror's fairness or impartiality. Ms. Brewton repeatedly said that she would be able to be fair to both sides despite her prior employment with Dr. McMahen and friendship with the McMahens, and the trial court based its decision upon its observation of the juror's demeanor as she gave her answers. Based on the record, there is no evidence that the trial court erred in accepting Ms. Brewton's answers and explanations.
The second juror at issue was Ms. Patricia Bearden. Ms. Bearden, a Springhill resident, stated:
But we've always been fairly good friends with Wayne [McMahen] and his wife. He was my son's baseball coach. Of course, we had horses and/or dogs all through the years and so Wayne has been our veterinarian and my husband grew up in the same town that Beverly did and worked for her father at one time."
Ms. Bearden admitted that her family had been friends with the McMahens for twenty years, but did not see them as frequently as they used to because their children were no longer in school together. She explained that she saw Dr. McMahen now only when she brought her animals to his office and that she did not socialize with him and his family. When asked if she could be a fair and impartial juror, she first replied, "I hope as a good citizen I could be. Yes, sir. And I would very much try to." She agreed that she could only consider the evidence presented in court and follow the law as given by the judge. She later repeated that she could be a fair and impartial juror despite her friendship with the McMahens. She said that she would not lend Dr. McMahen any more credibility because of her relationship with him.
The defendant challenged Ms. Bearden for cause, citing her relationship with the McMahens. The prosecutor responded that Ms. Bearden now only saw the McMahens in conjunction with Dr. McMahen's veterinary practice and not in a social setting. The court found that Ms. Bearden, like Ms. Brewton, was sufficiently rehabilitated and denied the challenge for cause, and again the court noted for the record an objection on behalf of the defendant to the ruling. Defendant White peremptorily challenged Ms. Bearden.
Ms. Bearden, like Ms. Brewton, had a personal friendship with Mr. McMahen, and like Ms. Brewton, Ms. Bearden repeatedly said that she could be a fair and impartial juror. Ms. Bearden informed the court and the parties that her present relationship with the McMahens was primarily professional, not personal, and that she had not seen them socially since their children were no longer in school. The trial judge was convinced that Ms. Bearden gave genuine answers and could be *695 fair, and this record does not undermine the trial judge's conclusion.
The third juror in question is Ms. Robin Fish. Ms. Fish owns Minden Home Care, a medical equipment service business. She said that the trial was being held at the busiest time of year for her business and that "if I get picked, I'll be having to work nights for sure." She agreed that jury service would cause her some stress or distraction "because I'm the only one that does our billing." When asked if her business concerns would interfere with her concentration and ability to devote time to the criminal case, she said that "it very well could." However, she indicated that she understood the applicable law, that she could judge the witnesses' credibility, and that apart from the concern about her business, she could be a fair and impartial juror.
The defendant challenged Ms. Fish for cause on the ground that her concern about her business and her work schedule would come into play in her deliberations. The prosecutor observed that Ms. Fish's answers "sounded more like a request for a hardship excuse than ... whether she was qualified and could sit as a juror." The court stated:
Oh, there'sI'm sure it's a hardship for her. It's a hardship on everybody up there. But my perception of Ms. Fish is that she'd rather be at work and she doesn't want to be inconvenienced. Well, that's why we have excuses ahead of time for and I could have explored it, you know, more beforehand. I think she's got plenty of sense. I think she could certainly sit here for a day and a half or two and give the trial the attention that it needs without any problem.
The trial court denied the challenge for cause, again noting an objection to the ruling for the defendants. The defendant used a peremptory challenge to excuse Ms. Fish.
This is the type of situation where the trial court's impression of the juror's reasons and demeanor are critically important. It is possible that a juror's concern over work or home life is so great that the juror's ability to be fair and impartial is called into question. Compare, e.g., State v. Gatti, supra.
In the instant case, the court's impression of Ms. Fish's situation was that Ms. Fish would be inconvenienced by her service, but that the inconvenience would not actually impair her ability to be fair despite her stated concerns to the contrary. The judge considered all of the juror's answers to questions and also took into consideration that the trial was likely to be of short duration, both of which were appropriate factors in deciding the likely impact of jury service upon Ms. Fish. Considering the juror's answers during voir dire as a whole and the deference shown to the trial court's findings based upon its observations of the juror, the trial court's decision is not clearly wrong.
The fourth and final juror in question was Christy Chreene-Rolen. Ms. Chreene-Rolen was a hairstylist who did not know any of the people involved in this offense. During questioning, she stated that she felt that the defendant must have done something wrong because he was present in court. She said:
Well, why would he be here if he hasn't done anything wrong? Why would he be charged with things if he hadn't done it?
However, she then agreed that the fact of arrest doesn't necessarily imply guilt and that sometimes people are falsely accused, and then she said:

*696 I'll have to hear all thelook at all the evidence to see [if the defendant is guilty].
Ms. Chreene-Rolen said that she could accept the law as given by the court and could make her determination of guilt from the evidence. She later stated that "there has to be some reason" why a police officer would arrest a person and initially said that she would require the defendant to put on any evidence to overcome her presumption. However, the prosecutor then observed that the juror appeared to be confused and questioned her further. Ms. Chreene-Rolen agreed that she understood that defendants do not have to present any evidence and that their silence could not be held against them. She further agreed that the fact of arrest does not equate to guilt, that guilt must be proven through evidence presented in court, and that she would not allow herself to be swayed by the fact of the defendants' arrest.
The defendants challenged Ms. Chreene-Rolen for cause, arguing that the juror would presume that they were guilty due to the fact of their arrest. The prosecutor responded that some of the questions were confusing and that the juror's answers reflected the confusion, an assertion that the defendants rejected. However, the court stated:
I do think she was confused. There's no doubt about that, but I don't think there's grounds to challenge her for cause. I think she was sufficiently rehabilitated and all.
The court denied the challenge for cause and, like in the other cases, noted an objection for the defendants to the ruling. Mr. White peremptorily challenged Ms. Chreene-Rolen.
The trial court made a finding that this juror was initially confused about the law. This finding is supported by the record of her answers as a whole. As was the case with one of the prospective jurors in Gatti, supra, the juror appeared to be pliable with respect to the questions about the presumption of innocence, but her later answers show, at least on the cold record, that she could understand and follow the law. The trial court was convinced that the juror had a sufficient understanding and acceptance of the law, and that finding is not clearly wrong.

Assignment of Error Number Three: Motion for Change of Venue
The defendant also argues on appeal that the trial court erred in denying his motion for change of venue. The defendant did not object to the denial of this motion, but no objection is necessary to preserve the issue for appeal when the court denies a written motion. La. C. Cr. P. art. 841(B).
The trial court is given much discretion in granting or denying a motion for change of venue. State v. Coleman, 32,906 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218. The defendant carries the burden of showing that there is more than just public knowledge of the facts surrounding the offense. The defendant must show a prevalent "community wide prejudice" that makes a fair trial in that parish impossible. Id. A defendant is not entitled to a jury that is entirely ignorant of his case. State v. Connolly, 96-1680 (La.7/1/97), 700 So.2d 810.
The defendant's argument on appeal only consists of two sentences, which argue that the defendant was unable to get a fair and impartial jury. There is no indication that publicity or any prejudice in the mind of the jurors necessitated a change of venue in this case. Many of the jurors knew little of the case and the jurors who knew the victim convinced the court that they *697 would be able to put that aside and hear the case impartially.
This assignment of error is without merit.

Assignment of Error Number Five: Excessiveness of Sentence.
Finally, the defendant argues that his two fifty-year hard labor sentences, to be served concurrently and without benefit of parole, are excessive. We note that Eason's sentences suffer from the same error patent disability noted by this court in its discussion of the sentences of his codefendant, White: the trial court did not specify an additional term for Eason's use of a firearm.
White and Eason were convicted of two counts of armed robbery with a firearm, a violation of La. R.S. 14:64 and La. R.S. 14:64.3. In both White's case and Eason's case, the trial court imposed two concurrent hard labor sentences without specifying any additional terms of imprisonment under La. R.S. 14:64.3. The majority in White, supra, found the sentences to be indeterminate because of the trial court's failure to impose the additional consecutive terms. The third circuit has followed this court's decision in White in State v. McGinnis, XXXX-XXXX (La.App. 3rd Cir.4/30/08), 981 So.2d 881, 889. See also State v. Birch, 41,979 (La.App. 2d Cir.05/09/07), 956 So.2d 793, where this court found a similar sentence indeterminate and vacated and remanded for resentencing.
Therefore, following the decision in White, supra, we must vacate the defendant's sentence and remand for resentencing, so that the trial court can clarify whether the defendant's two fifty-year hard labor sentences, to be served concurrently and without benefit of parole, include any additional punishment pursuant to La. R.S. 14:64.3.
As we have determined that the defendant's sentence must be vacated, the fifth assignment of error is moot, and the discussion on this subject is pretermitted. On remand the judge will resentence the defendant, and if the defendant believes the sentence imposed upon remand is excessive, he will have the right to appeal that sentence.

CONCLUSION
For the aforementioned reasons, we affirm the defendant's convictions, but vacate his sentences and remand for resentencing.
CONVICTION AFFIRMED; SENTENCE VACATED; AND REMANDED FOR RESENTENCING.
BROWN, Chief Judge, concurs with written reasons.
BROWN, Chief Judge, concurring.
A remand for resentencing is unnecessary. This is not an indeterminate sentence. See concurrence in White, supra. I would affirm both the conviction and sentence.
NOTES
[1] The minor's initials are used in lieu of her name. La. R.S. 46:1844(W).